NO. 07-05-0234-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL C

SEPTEMBER 22, 2006

_____

REMUDA RANCH, a partnership of THOMPSON AGRIPLEX 1, a trust,
THOMPSON AGRIPLEX 2 , a trust, THOMPSON AGRIPLEX 3, a trust,
THOMPSON AGRIPLEX 4, a trust, and BRUCE THOMPSON,

Appellants

v.

ARCHER-DANIELS-MIDLAND COMPANY and ADM/FARMLAND, INC.,

Appellees

_____

FROM THE 69TH DISTRICT COURT OF HARTLEY COUNTY;

NO. 4090H; HON. RON ENNS, PRESIDING

_____

*Memorandum Opinion*

_____

Before QUINN, C.J., and REAVIS and HANCOCK, JJ.

Remuda Ranch, a partnership of Thompson Agriplex 1, a trust, Thompson Agriplex 2, a trust, Thompson Agriplex 3, a trust, Thompson Agriplex 4, a trust, and Bruce Thompson (Remuda) appeal from a final summary judgment denying them recovery against Archer-Daniels-Midland Company and ADM/Farmland, Inc. (ADM). Remuda sued ADM for breach of its purported contract to buy Remuda's 2000 and 2001 corn crop. ADM moved for summary judgment, contending that it had no contract with Remuda and that any purported

oral agreement was unenforceable against it due to the statute of frauds. As previously mentioned, the trial court granted the motion, which act resulted in this appeal. We reverse and remand the cause.

*Background*

Given that the appeal is one from a final summary judgment, we construe the evidence of record in a light most favorable to the non-movant, *i.e.* Remuda. *Great American Reserve Ins. Co. v. San Antonio Plumbing Supply Co.,* 391 S.W.2d 41, 47 (Tex. 1965) (stating that the summary judgment evidence must be construed in a light most favorable to the non-movant). That evidence so construed depicts the following.

Mark Glawe of Farmland Industries (Farmland) approached Remuda about the acquisition of Remuda's corn crop for the years 2000 and 2001. According to the record, he was empowered to buy and sell food corn on behalf of his employer, Farmland. The two entered into negotiations culminating in an agreement. However, Glawe told Remuda that the sale had to be completed through AgriFarm Industries (AFI). The latter was a cooperative owned in part by Farmland and described by another Farmland employee "as an agent of Farmland." Apparently, AFI was used as a conduit through which Farmland bought corn from local growers. Once employees of Farmland (such as Glawe) negotiated the terms of the purchase, AFI would simultaneously execute corresponding contracts with the grower and Farmland. That is, through one contract it would buy the corn from the grower. Through the other, it would sell the corn to Farmland, in exchange for a commission of 2%. But, it had no authority to negotiate the terms because they were dictated to AFI by Farmland. And, this was the very procedure used to acquire the Remuda crop.

After AFI was told by Glawe that "'we have a deal with [Remuda]," an employee of AFI drafted and signed the requisite contracts. Those sent to Farmland were executed by that entity. Those sent to Remuda were not because they contained errors regarding "carry" and "storage." Effort was made to correct them, which efforts went for naught. Instead, according to the AFI employee, Remuda and Glawe "got tired of my incompetence . . . [and] bypassed me." At that point, Glawe told him '"not to worry about it,'" "'this is my project, and I'll take it from here.'"

In time, Farmland began receiving shipments of Remuda's corn. This continued until ADM acquired the assets of Farmland. After that acquisition, ADM received and paid for various shipments of the corn delivered by Remuda. However, it approached the grower in attempt to relieve itself from the contractual agreement. When that effort failed, it then opted not to complete further purchases. The decision resulted in Remuda suing ADM for breach of contract. ADM moved for summary judgment contending that it had no written contract with Remuda to buy the corn and that any oral contract was rendered unenforceable by the statute of frauds. The trial court granted ADM's motion.

*No Contract*

We address the initial contention that there existed no contract between Remuda and ADM to buy corn. The contention is founded upon the propositions that 1) Remuda did not contract directly with Farmland, and 2) if it did so contract, the contract was not one of the written agreements assumed in the ADM acquisition of Farmland's assets. According to Remuda, material questions of fact existed regarding both contentions, which questions precluded summary judgment. We agree.

3

The summary judgment motion propounded by ADM was traditional in nature. Thus, the burden lay with it to prove its entitlement to summary judgment as a matter of law. *Kimber v. Sideris,* 8 S.W.3d 672, 674-75 (Tex. App.–Amarillo 1999, no pet.). This is a weighty burden given that all reasonable inferences from the evidence must be made in favor of the non-movant. *Id.* at 675. Moreover, it matters not how we may construe the evidence if we were the factfinder; what matters is whether there exists some evidence of record which reasonable minds could interpret in a manner leading to different results. *Id.* at 676. If the latter situation exists, then so does a material issue of fact precluding summary judgment.

Of record, we find evidence illustrating that an employee of Farmland who was authorized to buy and sell food corn on behalf of that entity negotiated various purchases of corn from Remuda on behalf of Farmland. While consummation of the agreement normally required the use of a middleman, *i.e.* AFI, the step was "bypassed" by Glawe, the Farmland employee. Instead, he informed AFI that he had struck a "deal" with Remuda and that he would "take if from here." Thus, there is some evidence suggesting that Farmland contracted, albeit orally, with Remuda to purchase food corn.

Next, admittedly the evidence established ADM was not originally a party to the purported verbal agreements between Remuda and Farmland. Nonetheless, the agreements were open grain contracts. Moreover, in acquiring the assets of Farmland, the acquisition included, according to the "Purchase Agreement" signed by ADM and Farmland, "Farmland's rights under its open grain contracts as of the Closing Date." Furthermore, and contrary to the suggestions of ADM, nothing in that provision required the open grain contracts to be written. And, to the extent that the grain contracts contemplated were to be

4

listed in "Schedule 1.03(b)" of the purchase agreement, the burden lay with ADM to prove as a matter of law that none of the agreements itemized in that schedule encompassed the grain contracts between Remuda and Farmland. In other words, because it contended in its traditional motion for summary judgment that it was not bound by any contract to purchase grain from Remuda, ADM had to disprove all potential avenues of contract. And, we are cited to no evidence disproving, as a matter of law, that the open grain contracts encompassed in Schedule 1.03(b) included the agreements Glawe (on behalf of Farmland) orally struck with Remuda.[1]

In sum, ADM failed to carry its burden of proof. The evidence of record fell short of establishing, as a matter of law, that no contract bound the corporation to purchase corn from Remuda.

*Statute of Frauds*

Next, Remuda contends that ADM also failed to prove each element underlying its affirmative defense based upon the statute of frauds. We again agree.

A contract for the sale of goods equal to or exceeding $500 is unenforceable "unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker." TEX. BUS. & COM. CODE ANN. §2.201(a) (Vernon 1994). That the writing "omits or incorrectly states a term agreed upon" is of no consequence. *Id.*

---

[1]Nor are we cited to any evidence establishing that the "contract numbers" mentioned in the schedule referred only to written agreements or that oral contracts could not have been or were not assigned a number for inclusion in the list. The testimony of Tim Daugherty, Mark Beemer, and Glen Hofbauer (to which ADM alluded) did not so establish; indeed, the comments to which we were cited do not pertain to the contents or scope of Schedule 1.03(b). And, while it may be sensible to assume that only written contracts were included, business practices do not necessarily comport with common sense. For this reason, ADM had the burden to prove that the Remuda/Glawe/Farmland agreements were not included.

5

Appearing of record is 1) some evidence of oral agreements being struck by Remuda and Grawe/Farmland and which we previously discussed, 2) evidence of the various written contracts drafted and signed by AFI purportedly incorporating the terms of the oral agreements, and 3) evidence of AFI's status as Farmland's agent. These circumstances liken to those in *Tryad Serv. Corp. v. Machine Tool Center, Inc..* 512 S.W.2d 785 (Tex. Civ. App.–Houston [14th Dist.] 1974, writ ref'd n.r.e.).

In *Tryad*, Tryad negotiated the purchase of a thread mill from Reed Tool. However, Reed designated Machine Tool as the middleman through which the sale was to be consummated. That is, Machine was to buy the mill from Reed and then sell it to Tryad for the price agreed upon by Tryad and Reed. Machine and Tryad then executed a written memorandum memorializing the terms of the sale, and a representative of Machine signed the document. Thereafter, Reed refused to sell the mill. Upon being sued by Tryad, Reed contended that any agreement it had with Tryad was unenforceable under §2.201 of the Business and Commerce Code. The appellate court rejected the contention, however. It found of record evidence indicating that Reed granted Machine authority to bind it *viz* the sale of the mill. *Id.* at 788-89. Given that evidence, the written memorandum between Tryad and Machine was sufficient to defeat Reed's invocation of the statute of frauds, according to the court. *Id.*

Like Machine Tool, AFI acted as the broker or agent of Farmland in purchasing the Remuda corn, or at least some evidence indicates. So, like Tryad, Remuda can use the contract executed with the broker or agent (AFI) to satisfy the statute of frauds, assuming of course, the factfinder ultimately determines that AFI was the agent or broker of Farmland. And, that the AFI contracts may contain inaccurate information about some of the terms of

6

the sale, such as those relating to carriage and storage, is of no consequence given the directive of §2.201(a); again, the statute dictates that "a writing is not insufficient because it omits or incorrectly states a term agreed upon . . . ." TEX. BUS. & COM. CODE ANN. §2.201(a) (Vernon 1994). So, having agreed to acquire Farmland's open grain contracts and unless it is proven that the Remuda/Glawe/Farmland agreements were not part of Schedule 1.03(b) of the Farmland/ADM Purchase Agreement, we cannot say that ADM was entitled to judgment, as a matter of law, on its claim of statute of frauds.

Having determined that ADM fell short of carrying its burden regarding both of its grounds for summary judgment, we hold that the trial court erred in executing the decree. Accordingly, the summary judgment is reversed, and the cause is remanded to the trial court.


Brian Quinn
Chief Justice

7